UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------x

 ORBIS GLOBAL EQUITY LE FUND
 (AUSTRALIA REGISTERED) et al.,

                        **MEMORANDUM & ORDER**
              Plaintiffs,        21-CV-6590 (EK)(VMS)

         -against-

 VALE S.A. et al.,

              Defendants.

-------------------------------------x
ERIC KOMITEE, United States District Judge:

         Vale S.A. is a large iron-ore mining company.  On January 25, 2019, one of its dams collapsed, leading to disaster: the event killed 270 people and caused severe damage to the surrounding environment.

         This was not the first time a Vale dam had collapsed. In 2015, another collapse — of a dam owned by a Vale joint venture — killed 19 people and similarly wreaked environmental havoc.  In the wake of that collapse, Vale made a series of public statements about its risk-management practices and the safety and stability of its dams.

         After the 2019 collapse, Vale's stock price plummeted. Investors commenced a putative securities-fraud class action in this district against the company and several of its executives. *See In re Vale S.A. Securities Litigation*, No. 19-cv-526 (E.D.N.Y.).  Judge Dearie, then presiding, granted the

defendants' motion to dismiss that case in part.  He later denied a motion for reconsideration.  *Id.*, ECF Nos. 74, 80.

This is a different (albeit related) case.  The plaintiffs here are eight investment funds — all advised by Orbis Investment Management Limited — who opted out of the class action.  The complaint in this action largely tracks the one in the class action, except that it adds new causes of action under Section 18 of the Exchange Act and state common law, adds new "scheme liability" allegations under Section 10(b), and alleges four misstatements that are absent from the class action complaint.  The instant complaint also incorporates findings from two reports that Vale issued after the filing of the class action complaint: (1) the *Report of the Expert Panel on the Technical Causes of the Failure of Feijão Dam I*, dated December 12, 2019 (the "Expert Panel Report"); and (2) an executive summary of Vale's independent investigation report, dated February 20, 2020 (the "Independent Investigation Report").

Vale moved to dismiss the fund plaintiffs' Section 18, common-law fraud, and Section 20(a) claims in full.  It also moved to dismiss the Section 10(b) claim as to the individual defendants and the new alleged misstatements.  The Court held oral argument, following which the plaintiffs sought — and received — leave to file an amended complaint.  The parties then

2

submitted supplemental briefing.  For the reasons set forth below, the motion to dismiss is now granted in part.

## I.    Background

The facts described herein are taken from the amended complaint.  *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

## A.    The Parties

The plaintiffs (referred to collectively herein as "Orbis") are eight affiliated investment funds that purchased or acquired Vale Common American Depositary Shares ("ADSs") and Vale Preferred ADSs on or after December 23, 2016 (and held those shares through January 25, 2019), but opted out of the Class Action.  Compl. ¶¶ 36-44.  The defendants are Vale S.A. ("Vale") and five of its executives.  Defendant Murilo Ferreira was Vale's Chief Executive Officer from May 2011 through May 2017.  *Id.* ¶ 46.  He was succeeded by defendant Fabio Schvartsman, who served as CEO through March 2019.  *Id.* ¶ 47. Defendant Gerd Peter Poppinga was the Executive Director of Vale's Ferrous Minerals division from July 2017 through March 2019.  *Id.* ¶ 49.  Defendant Luciano Siani Pires has been the Executive Director of Finance and Investor Relations since August 2012 and was also the chair of the Executive Risk Committee.  *Id.* ¶ 48.  Finally, defendant Luiz Eduardo Froes do

3

Amaral Osorio has been the Executive Director of Sustainability and International Business since July 2017.  *Id.* ¶ 50.

**B.    Events Prior to the January 2019 Dam Collapse**

Vale is alleged to have been (as of November 2023) the world's largest producer of iron ore and pellets, operating mines primarily in Brazil.  *Id.* ¶ 51.  "Tailings" are the waste byproducts that remain after the saleable part of iron ore is separated out.  *Id.* ¶ 52.  These tailings are often stored in earth-filled embankments known as tailings dams.  *Id.*  Tailings dams can be assembled in different ways.  "Upstream construction" is the least expensive method of construction but also the riskiest.  *Id.* ¶¶ 54, 59.

On November 5, 2015, an upstream tailings dam operated by a Vale joint venture in Mariana, Brazil collapsed.  This event — referred to as the "Mariana" or "Fundão" collapse — killed nineteen people, destroyed a nearby town, and polluted the water supply relied upon by hundreds of thousands of residents.  *Id.* ¶ 61.  This catastrophe led to the passage of dam-safety legislation in Brazil that required Vale to satisfy new regulatory requirements, including annual safety certifications and biannual dam audits.  *Id.* ¶¶ 63, 108, 385.  It also elicited investor interest in Vale's dam safety and the potential for a future collapse.  *Id.* ¶¶ 7, 12.  Vale's CEO even "coined a new company motto" — "Mariana, Never Again!"  *Id.* ¶ 8.

4

In the years following the Mariana dam collapse, Vale executives made a litany of public statements about Vale's dam safety and risk management practices.  These statements appeared in Vale's Annual Reports, Sustainability Reports, Form 6-Ks, and publicly available presentations and articles.  And though Vale had audited its dams before the Mariana collapse, the new regulatory regime now required it to do so more frequently.

Plaintiffs identify thirty-three alleged misstatements that Vale and its executives made during this period.  *See id.* ¶¶ 246-365.  These include Vale's assertions that its dams were stable and safely managed, and that external auditors had verified the dams' safety.  *Id.* ¶¶ 246, 252, 267, 279. Plaintiffs also allege that Vale misrepresented the sufficiency of its risk management strategies, internal disclosure controls, and commitment to safety, sustainability, and the environment. *Id.* ¶¶ 291, 296, 301, 338-40.

**C.    January 2019 Dam Collapse, Subsequent Investigations, and Stock-Price Reaction**

On January 25, 2019, Dam 1 of Vale's Córrego do Feijão iron ore mine ("Dam 1") collapsed, killing 270 people and causing extensive environmental damage.  *Id.* ¶¶ 17, 195.  The same day, Vale confirmed media reports that the dam had burst, resulting in possible fatalities.  *Id.* ¶¶ 196-97, 432.  Vale's stock price declined steeply as reports of the dam collapse

spread.  Vale ADSs fell by $1.20 per share from the previous closing price of $14.86 — a decline of over 8%.  *Id.* ¶¶ 195-96. The following trading day, Vale's ADSs dropped an additional $2.46 per share.  *Id.* ¶ 197.

This incident led to a number of investigations and the publication of several reports, including the Vale Expert Panel and Independent Investigation Reports discussed above, as well as a July 2019 Brazilian Senate Report and a September 2019 Minas Gerais House of Representatives Report.[1]  *Id.* ¶ 83. According to Orbis, these reports reveal that Vale knew prior to the collapse — through internal risk analyses and audits — about the precarious state of Dam 1, as well as the unacceptable safety risks posed by numerous other Vale tailings dams.  *Id.*

In quantifying its damages, Orbis points to certain additional stock-price declines throughout the following year, which it seeks to connect to later Dam 1-related disclosures, including those made in the investigatory reports.  *Id.* ¶¶ 198-209.

---

[1] The class action complaint refers to both the Senate Report and House of Representatives Report.  As noted above, the Expert Panel Report and Independent Investigation Summary postdate the filing of the class action complaint.

## II.  Legal Standard

### A. Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead facts sufficient "to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).[2]  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiffs' favor.  *See Lundy v. Cath. Health Sys. of Long Island Inc.*, 711 F.3d 106, 113 (2d Cir. 2013).  At the same time, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation."  *Iqbal*, 556 U.S. at 678.

### B. Rule 9(b) and the PSLRA

Securities fraud claims are subject to the "heightened pleading requirements" of both Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA").  *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 166 (2d Cir.

---

[2] Unless otherwise noted, when quoting judicial decisions this order accepts all alterations and omits all citations, footnotes, and internal quotation marks.

2021). Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). "Allegations that are conclusory or unsupported by factual assertions are insufficient." *ATSI Commc'ns*, 493 F.3d at 99. The PSLRA further requires a plaintiff to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Thus, plaintiffs "must do more than say that the statements were false and misleading; they must demonstrate with specificity why and how that is so." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014).

Like federal securities claims, common-law fraud claims must also satisfy the requirements of Rule 9(b). *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004).

### III. Discussion

Defendants "do not ask the Court to reconsider any of its previous rulings in the Class Action." Defs.' Br. 1, ECF No. 27. They do, however, seek to dismiss the Section 18 and common-law fraud claims, which have no analogue in the class action. They also seek to dismiss the Section 10(b) and Section

8

20(a) controlling-person claims against the Individual Defendants.  *Id.*  Finally, they seek a ruling that several newly alleged misstatements are inactionable under Section 10(b).  *Id.*

**A.    Plaintiffs' Section 18 Claim Is Not Time-Barred**

Vale argues that plaintiffs' Section 18 claim is time-barred, invoking the two-year limitations period set forth in 28 U.S.C. § 1658(b)(1).  *See Dekalb Cnty. Pension Fund v. Transocean Ltd.*, 817 F.3d 393, 407 (2d Cir. 2016), *as amended* (Apr. 29, 2016) (Section 1658(b) statute of limitations governs Section 18 claims).  Orbis counters that the claims are timely because, under *American Pipe & Construction Co. v. Utah*, the filing of the complaint in *In Re Vale* tolled the statute of limitations for this action.  *See* 414 U.S. 538 (1974).  Plaintiffs have the better argument.

In *American Pipe*, the Supreme Court held that "the commencement of a class action suspends the applicable statute of limitations" for putative class members.  *Id.* at 554.  The Court later clarified that *American Pipe* tolling applies to class members, like Orbis, who opt out and file individual suits.  *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 176 n.13 (1974); *see also In re WorldCom Sec. Litig.*, 496 F.3d 245, 254-55 (2d Cir. 2007) (summarizing the relevant Supreme Court precedent).

*American Pipe* and its progeny focus on both efficiency and fairness to all parties. Fairness to the putative class requires tolling because its members "are expected and encouraged to remain passive during the early stages" of a class action, relying "on the named plaintiffs to press their claims." *Cullen v. Margiotta*, 811 F.2d 698, 719 (2d Cir. 1987), *overruled on other grounds*, *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143 (1987); *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 352-32 (1983). At the same time, tolling is fair to the defendants: the filing of the putative class action has put them on notice "not only of the substantive claims being brought against them, but also of the number and generic identities of the potential plaintiffs who may participate in the judgment." *American Pipe*, 414 U.S. at 555. So notified, the defendants face a reduced risk that documentary evidence will be lost, or that witnesses' memories will fade. *Cullen*, 811 F.2d at 720.

Given these considerations, *American Pipe* tolling is "properly extended to claims" that involve "the same evidence, memories, and witnesses as were involved in the initial putative class action." *Id.* This is true even where there are "differences between the legal theories advanced by plaintiffs" in the prior action and the one then under consideration. *Id.; see also MYL Litigation Recovery I LLC v. Mylan N.V.*, No. 19-CV-

1799, 2020 WL 1503673, at *7-8 (S.D.N.Y. Mar. 30, 2020) (factual similarity, not legal similarity, is key).

The Second Circuit has not explicitly ruled on the issue presented here — whether a prior Section 10(b) class claim can toll an individual Section 18 claim.  But this question recurs frequently,[3] and most district courts have said that Section 18 claims do not qualify for *American Pipe* tolling. *See, e.g.*, *Gotham Diversified Neutral Master Fund, LP v. Chicago Bridge & Iron Co. N.V.*, No. 18-CV-9927, 2019 WL 3996519, at *3 (S.D.N.Y. Aug. 23, 2019) (collecting cases); *Orbis Glob. Equity Fund Ltd. v. NortonLifelock Inc.*, No. 21-CV-01995, 2023 WL 1800963, at *7 (D. Ariz. Feb. 7, 2023) (describing "majority" view "that Section 10(b) claims raised in class actions do not toll the statute of limitations for later-filed Section 18 claims").  Indeed, one court concluded that "almost by definition, filing a § 10(b) class action does not put a defendant on notice that it will be called upon to defend a § 18

---

[3] Section 18 claims are difficult to maintain on a classwide basis because they require plaintiffs to show they actually relied on a defendant's misrepresentation.  *E.g.*, *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011) ("[R]equiring proof of individualized reliance from each member of the proposed plaintiff class effectively . . . prevent[s] such plaintiffs from proceeding with a class action.").  Institutional investors, by contrast, have the incentives to litigate an individual securities fraud case and are well situated to show actual reliance.  *See, e.g.*, *Villare v. ABIOMED, Inc.*, No. 19-CV-7319, 2020 WL 3497285 at *7 (S.D.N.Y. June 29, 2020) (noting that institutional investors have a significant financial interest in securities litigation).  Accordingly, institutional investors often choose to opt out of a class action asserting only Section 10(b) claims and file their own cases raising both Section 10(b) and Section 18 claims.

claim." *Children's Hosp. & Med. Ctr. Found. of Omaha v. Countrywide Fin. Corp.*, No. 11-CV-02056, 2011 WL 13220509, at *4 (C.D. Cal. Aug. 22, 2011).

We respectfully disagree. The cases holding that *American Pipe* tolling does not apply focus on the difference in the "[t]he legal standards for proving § 18 and § 10(b) claims." *Gotham*, 2019 WL 3996519, at *3; *see also Children's Hospital*, 2011 WL 13220509, at *3 (tolling did not apply because "legal standards for bringing an action under § 18 are significantly different from those for § 10(b)"). But "[f]or a plaintiff who wishes to take advantage *of American Pipe* tolling, the legal theory asserted is not the relevant metric." *MYL Litig.*, 2020 WL 1503673, at *8. Rather, as described above, the relevant question is whether the new case relies on "new *factual* bases." *Id.* at *8 (emphasis added); *Cullen*, 811 F.3d at 721.

Here, the defendants — who are ably represented — point to no evidence relevant to the Section 18 claim that is not also relevant to defending the Section 10(b) claim. Instead, they quote the cases addressed above and point to the differences in Sections 10(b) and 18's legal standards. Defs.' Br. 10-11. And the Court, like plaintiffs, is "hard pressed to conclude that the [earlier] complaint was not sufficient to alert the defendants . . . to preserve the evidence" required to defend the instant Section 18 claim. *Cullen*, 811 F.2d at 721.

12

To prove a Section 18 claim, a plaintiff must show that (1) the defendant "ma[d]e or cause[d] to be made" a "false or misleading statement" in a filing with the Securities and Exchange Commission, (2) upon which the plaintiff actually relied, (3) resulting in loss to the plaintiff.  15 U.S.C. § 78r(a); *Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 645 Fed. App'x 72, 75 (2d Cir. 2016). Plaintiffs' allegations regarding the false and misleading statements and loss causation are almost identical to those in the earlier class action.[4]  *See* Compl. ¶¶ 246-336 (false and misleading statements also at issue in class action); ¶¶ 428-453 (loss causation allegations also at issue in class action).  And "no special preservation of witnesses or evidence would ordinarily be necessary" for defendants to litigate actual reliance, *Cullen*, 811 F.2d at 720-21, because the facts and evidence relevant to that issue are uniquely in plaintiffs' possession.

---

[4] Plaintiffs add allegations regarding four additional loss-causation events that postdate the filing of the amended class action complaint. *See* Compl. ¶¶ 454-477.  But three of those events — the release of the Brazilian Senate Report, the announcement of criminal charges related to the Dam 1 collapse, and the release of the Vale Independent Investigation Report — clearly relate to the same underlying misconduct and factual allegations. *Cf.* Fed. R. Civ. P. 15(c)(1) ("amendment to a pleading relates back to the date of the original pleading when . . . [it] asserts a claim or defense that arose out of the [same] conduct, transaction, or occurrence").  One new loss-causation event — a May 2019 report about issues at an entirely different Vale dam — is far more attenuated.

13

It is true that good faith is an affirmative defense under Section 18, *see* 15 U.S.C. § 78r(a), but not Section 10(b). Still, the evidence relevant to that defense is substantially similar to that needed to dispute scienter under Section 10(b). *See, e.g.*, David Brodsky et al., *Federal Securities Litigation, A Deskbook for the Practitioner*, 9-7. This is because refuting good faith will "as a practical matter . . . generally involve proof of a defendant's state of mind," specifically that "a defendant acted, at a minimum, recklessly." *DeKalb*, 817 F.3d at 407. And, as discussed in Section III.B.2, below, plaintiffs here and in the class action rely on similar allegations of recklessness to prove scienter under Section 10(b).

Plaintiffs' Section 18 claim is timely under *American Pipe*. We need not address whether the tolling of that claim extends to the four new alleged misstatements, as those statements are immaterial in any case. *See* Section III.B.3, below.

B.  **Challenges to the Section 10(b) and Section 20(a) Claims**

Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe."

14

15 U.S.C. § 78j(b).  The SEC's implementing rule, Rule 10b-5, provides that it is unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."  17 C.F.R § 240.10b-5(b).

The elements of a Section 10(b) claim are: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008).  An omission is actionable when (among other requirements) disclosure of the information is "necessary in order to make statements made, in the light of the circumstances under which they were made, not misleading." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) (quoting Rule 10b-5).

Defendants level several arguments at the Section 10(b) claims.  *First*, plaintiffs improperly rely on group pleading to ascribe statements to defendants that did not make them.  *Second*, plaintiffs fail to plausibly allege scienter as

15

to the individual defendants.[5]  *Third*, the new alleged misstatements are immaterial.  *Fourth*, plaintiffs fail to adequately allege scheme liability.

1.   The Individual Defendants' Liability Is Limited to Those Statements They Are Alleged to Have Made

To be liable under Section 10(b), a defendant must have "made" the alleged misstatement(s).  *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 141 (2011).  In this context, "the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it."  *Id.* at 142.

Vale argues that, in many places, the complaint fails to plead facts showing that any individual defendant had "ultimate authority" over a given misstatement.  Defs.' Br. 21-23.  Plaintiffs dispute this, invoking the "group pleading doctrine," which they argue survived the Supreme Court's decision in *Janus*.  Pls.' Mem. 17-18, ECF No. 28.[6]  We disagree with plaintiffs' reading of *Janus* and the group-pleading cases.

---

[5] They argue that plaintiffs' Section 20(a) claim fails for the same reason.

[6] Orbis acknowledges that, even under the group-pleading standard, not all individual defendants can be liable for all misstatements.  They assert that (1) Ferreira and Schvartsman should be liable for all statements made during the time each served as Vale's CEO, Pls.' Br. 17; (2) Siani should be liable for all statements, given his role as Vale's Executive Director of Finance and Investor Relations, head of the Business Risk Management division, and chair of the Executive Risk Committee, *id.* at 18; (3) Osorio should be liable for certain misstatements about sustainability and safety, given his position as Vale's Executive Director of Sustainability and International Business, *id.;* and (4) Poppinga should be liable solely for the misstatement alleged in paragraph 259 of the amended complaint.  Pls.' Supp. Br. 9-10, ECF No. 46.

16

The group pleading doctrine "permit[ted] securities fraud plaintiffs to rely on a presumption that statements in prospectuses, registration statements, annual reports, press releases, or other group-published information, are the collective work of those individuals with direct involvement in the everyday business of the company." *In re Banco Bradesco Sec. Lit.*, 277 F. Supp. 3d 600, 637 (S.D.N.Y. 2017). Therefore, rather than attributing a particular statement to a particular defendant, a plaintiff could plead "that the individual defendants were corporate insiders involved in the everyday business of the company, and that the statements [at issue] were made in group-published documents." *Id.* at 639.

We hold, as have other courts in this Circuit, that "a theory of liability premised on treating corporate insiders as a group cannot survive a plain reading of the *Janus* decision." *In re UBS AG Sec. Litig.*, No. 07-CV-11225, 2012 WL 4471265, at *10 (S.D.N.Y. Sept. 28, 2012), *aff'd sub nom. City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014) (collecting cases).[7] *Janus* expressly rejected the idea that "creating" a statement by "prepar[ing]" "publish[ing]" or "participating in the drafting" of it equates to having "ultimate authority over the statement." *Janus*, 564 U.S. at

---

[7] The Second Circuit has noted that the "continuing viability of group pleading" is in question following *Janus*, but it has not squarely ruled on the issue. *Colbert v. Rio Tinto PLC*, 824 F. App'x 5, 10 (2d Cir. 2020).

17

143-46. Instead, "attribution within a statement or implicit from surrounding circumstances is [ordinarily] strong evidence that a statement was made by — and only by — the party to whom it is attributed." *Id.* at 142-143. While, as plaintiffs correctly point out, the defendants in *Janus* were third party advisors, nothing suggests its holding is limited to such parties. Thus, "[i]f undeniable proof that an individual worked on a statement does not meet *Janus*'s requirement," evidence under the group-pleading doctrine "must also fall short." *In re Banco Bradesco*, 277 F. Supp. 3d at 638-41.

One upshot of the foregoing analysis is that plaintiffs' Section 10(b) claim against defendant Poppinga must be dismissed. The only misstatement Poppinga is alleged to have made comes from an April 2018 Valor Econômico article. The article quotes defendant Schvartsman as saying Vale's dams were in "impeccable" and "impressive" shape. Compl. ¶ 258. Plaintiffs allege that "this statement was based on an email [Schvartsman] received from Defendant Poppinga 'affirming' that Vale's dams were 'impeccable' and 'impressive.'" *Id.* ¶ 259. But *Janus* explicitly held that Section 10(b) does not "permit private plaintiffs to sue a person who provides the false or misleading information that another person then puts into the statement." *Janus*, 564 U.S. at 144-45. Accordingly, plaintiffs

18

have not pleaded sufficient facts to support the claim that Poppinga was the "maker" of any alleged misstatement.

All other defendants are plausibly alleged to have been the maker of at least one statement.  The case will therefore continue as to them.  Each individual defendant's liability under Section 10(b), however, will be limited to those statements he is specifically alleged to have made.

2.   Plaintiffs Plausibly Allege Scienter

To establish liability under Section 10(b), plaintiffs must allege that a defendant acted with scienter, "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 319 (2007).  The PSLRA requires plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" "with respect to each act or omission alleged to violate" Section 10(b).  15 U.S.C. § 78u-4(b)(2)(A).  An inference of scienter will be strong only when it is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 309.  To raise such an inference, a complaint must allege facts showing either (1) "motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *ECA, Loc.*

*134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197-98 (2d Cir. 2009).

Plaintiffs allege adequate evidence of conscious misbehavior or recklessness on the part of the individual defendants.[8]  So, their Section 10(b) claims survive against each individual defendant (except Poppinga, as discussed above).

"Conscious misbehavior or recklessness . . . can be established by showing . . . that defendants knew facts or had access to information suggesting that their public statements were not accurate."  *In re Centerline Holding Co. Sec. Litig.*, 380 F. App'x 91, 93 (2d Cir. 2010).  In the class action, Judge Dearie held that this standard had been met at the pleading stage.  *In re Vale S.A. Securities Litigation*, No. 19-cv-526, ECF No. 74, at 19-31 (E.D.N.Y.).

---

[8] Because we conclude that plaintiffs have adequately alleged recklessness, we need not reach motive and opportunity.  Under current case law, the bar for pleading motive and opportunity is very high.  Plaintiffs may not rely on "motives possessed by virtually all corporate insiders," such as the desire to maintain a high stock price "in order to increase executive compensation or prolong the benefits of holding corporate office."  *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000).  Indeed, some courts have gone so far as to say that motives relating to the "very survival" of a company — such as avoiding bankruptcy — are insufficient.  *See In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 531-32 (S.D.N.Y.), *aff'd sub nom. Condra v. PXRE Grp. Ltd.*, 357 F. App'x 393 (2d Cir. 2009) (collecting cases).  But here, plaintiffs do not simply allege that Vale's insiders wanted to keep the stock price high.  Rather, they point to the collapse of another Vale-owned dam in 2015 that also resulted in casualties and environmental destruction.  Given the intense focus thereafter on the mining industry, and Vale in particular, in the wake of that collapse, Vale's insiders allegedly had every incentive to "lull [its] investors into thinking that dam safety remained a priority and that the risk of another dam collapse was being minimized."  Pls.' Supp. Br. 4.  We think that where plaintiffs allege so specific a motive, that should likely be sufficient.  *Cf. In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 269-71 (2d Cir. 1993) (plaintiffs' allegations of motive sufficiently specific to survive motion to dismiss).

20

Defendants do not seek to relitigate that holding here. They instead argue that by incorporating the Expert Panel Report and Independent Investigation Report into the amended complaint, plaintiffs have undermined their own allegations of scienter. Defs.' Br. 17. For example, the Independent Investigation Report concluded that "no information regarding the risk of Dam 1's collapse was disclosed to Vale's high-level executives." *Id.* at 7. And the Expert Panel Report asserts that there were "no signs of distress" prior to Dam 1's collapse such that Vale's executives could not have known about the collapse. *Id.* at 8, 15. Because plaintiffs cite portions of these reports, Vale asks the Court to accept as true the entire contents of each report. Defs.' Reply 4, ECF No. 30.

The parties spill much ink about the extent to which the Court should consider these two reports on a Section 12(b)(6) motion. But that dispute is ultimately immaterial. Even considering the reports in their entirety — as defendants request — the amended complaint still sufficiently alleges a strong inference of scienter.[9]

---

[9] District courts may permissibly consider documents outside the complaint on a motion to dismiss when the complaint "relies heavily upon [their] terms and effect, which renders the document[s] integral to the complaint." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 & n.3 (2d Cir. 2002). A court may consider a document "integral" to the complaint even if the complaint "contains only limited quotation from that document." *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Co.*, 75 F.3d 801, 808 (2d Cir. 1996). Nor must the court "limit its consideration to [the plaintiff's] selected quotations": it may consider the "full text" of the

21

The portions of the reports the defendants cite as refuting scienter raise, at most, a question of fact more appropriately resolved at summary judgment. *Roth*, 489 F.3d. at 509 ("[A] ruling on a motion for dismissal pursuant to Rule 12(b)(6) is not an occasion for the court to make findings of fact."). For example, defendants emphasize the Expert Panel Report's finding that the collapse was sudden, and that Dam 1 showed "no signs of distress" leading up to it. Expert Panel Report 69, ECF No. 26-4. But the report simultaneously states that Dam 1 was only a "marginally stable dam (*i.e.*, close to failure in undrained conditions)," due to issues with things like design and water management that long predated the collapse. *Id.* at iv. Similarly, defendants claim that the Independent Investigation Report confirms that information about Dam 1's safety was not disclosed to high level executives. *See* Defs.' Br. 15. But the report focuses on information disclosed in a particular set of meetings: those of "the Board of Directors and their main Advisory Committees." Independent Investigation Report 26-27, ECF No. 26-3. Even if we presumed

---

outside documents to contextualize the plaintiff's quotations. *Id.* at 808-09. Courts will generally "accept the factual allegations contained in the [integral documents] as sufficiently reliable as a factual source for [p]laintiffs' allegations." *McIntire v. China MediaExpress Hldgs., Inc.*, 927 F. Supp. 2d 105, 124 (S.D.N.Y. 2013). Critically, however, resolution of factual disputes is not appropriate at the motion-to-dismiss stage, and the Second Circuit has cautioned that even if documents are integral to the complaint, they should be considered "only to determine *what* the documents stated, and *not to prove the truth of their contents*." *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007).

its truth, then, the report would not foreclose the plaintiffs' allegations that the individual defendants received such information through other channels, such as the risk matrix and monthly risk reports.  *See In Re Vale*, No. 19-CV-526, Order Den. Recons. 6-7.

To the extent the Independent Investigation and Expert Panel Reports present contradictory evidence regarding scienter, that conflict will not be resolved on a motion to dismiss.  At this stage, plaintiffs have adequately alleged defendants' knowledge.

3.   The New Alleged Misstatements Are Not Material

Orbis alleges four new misstatements related to disclosure controls and procedures that were not pleaded in the Class Action.  None is actionable.

Two of the misstatements are taken from substantially similar sections of Vale's 2016 and 2017 Annual Reports, which read, in relevant part:

> Our chief executive officer and chief financial officer have concluded that our disclosure controls and procedures were effective to provide reasonable assurance that information required to be disclosed by us in the reports filed or submitted under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the applicable rules and forms, and that it is accumulated and communicated to our management, including our chief executive officer and chief financial officer, as appropriate to allow timely decisions regarding required disclosure.

23

Compl. ¶¶ 338, 339.  The other new misstatements consist of substantially identical certifications that Vale made pursuant to Section 302 of the Sarbanes-Oxley Act ("SOX"), again in both 2016 and 2017.  *Id.* ¶¶ 340-41.  In the SOX certification, the CEO and CFO affirmed: "The company's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures" and have "[e]valuated the effectiveness of the company's disclosure controls and procedures."  *Id.* ¶ 340.

Plaintiffs allege that these statements were false because Vale did not have the effective internal disclosure controls and procedures it claimed.  *Id.* ¶ 342; *see also* Pls.' Supp. Br. 11, ECF No. 46.  To support that allegation, plaintiffs rely on Schwartzman's deposition testimony that he did "not recall" serving on Vale's Disclosure Committee or attending its meetings, or even know that the committee existed, despite having been appointed its Chair.  Compl. ¶ 349.  The amended complaint also includes allegations about Vale's hierarchical structure and the rigid channels for reporting safety concerns within the geotechnics group.  Compl. ¶¶ 355-65. Orbis contends that these allegations demonstrate that "[d]efendants could not have reasonably believed that Vale had effective internal controls over disclosures."  Pls.' Supp. Br. 11.  But defendants argue that whether these statements were

24

false does not matter: they were too generic to be material to investors.  Defs.' Supp. Br. 9-10, ECF No. 45.  Defendants are correct.

A statement can only give rise to a Section 10(b) violation if it is one that a reasonable investor would rely on. "Assertions of satisfactory regulatory compliance can be materially misleading if the descriptions of compliance efforts are detailed and specific."  *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 103 (2d Cir. 2021).  But "[i]t is well-established that general statements about reputation, integrity, and compliance with ethical norms are inactionable puffery, meaning that they are too general to cause a reasonable investor to rely upon them."  *Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019).

The Second Circuit has held that statements like those at issue here constitute puffery.  *See ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187 (2d Cir. 2009) (statement affirming that company has "risk management processes [that] are highly disciplined" and "set the standard for integrity" was too general to induce reliance); *Plumber & Steamfitters Loc. 773 Pension Fund*, 11 F.4th at 103 (statement that defendant "strive[s] to conduct [its] business in accordance with internationally recognized principles [of] . . . anti-corruption" too vague to be actionable).  The

25

disclosure-control misstatements simply affirm that Vale's disclosure controls were effective, without describing what those controls were or how they operated.  Accordingly, whether the statements were false — and whether defendants knew they were false when made — is irrelevant.  "[T]heir generality . . . prevents them from rising to the level of materiality required to form the basis for assessing a potential investment."  *In re Liberty Tax, Inc. Sec. Litig.*, 828 F. App'x 747, 751 (2d Cir. 2020).  Plaintiffs' 10(b) claim may not proceed as to the new alleged misstatements.

4.   Plaintiffs Fail to Allege Scheme Liability Against the Individual Defendants

Orbis also argues that — separate and apart from any liability for misstatements — the individual defendants are liable under Rule 10b-5(a) and (c) for perpetrating a fraudulent *scheme*.  "Scheme liability" is premised on deceptive conduct independent of misrepresentations or omissions.  *See SEC v. Kelly*, 817 F. Supp. 2d 340, 344 (S.D.N.Y. 2011).

To state a scheme liability claim under Rule 10b-5(a) or (c), "a plaintiff must show: (1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance."  *Plumber & Steamfitters Loc. 773 Pension Fund*, 11 F.4th at 105.

Plaintiffs have failed to plead scheme liability because they do not "identif[y] any deceptive act apart from the alleged misrepresentation." *Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 586 (S.D.N.Y. 2016) (dismissing claim). Instead, the complaint "rests upon the incorporation of the previous [110] pages of the pleading" paired with the conclusory assertion the defendants "employed devices, schemes and artifices to defraud." *Plumber & Steamfitters Loc. 773 Pension Fund*, 11 F.4th at 105; *see* Compl. ¶ 482. "Absent some sort of enumeration of which specific acts constituted an alleged scheme," plaintiffs' claim "cannot go forward." *Plumber & Steamfitters Loc. 773 Pension Fund*, 11 F.4th at 105.

5.   Plaintiffs' Section 20(a) Claim Survives

In their Section 20(a) claim, plaintiffs allege that, as controlling persons, "[d]efendants Ferreira, Schvartsman, Siani, Poppinga, and Osorio culpably participated in Vale's violation of Section 10(b) and Rule 10b-5." Compl. ¶¶ 491-99. Defendants' only argument for dismissal of this claim is that plaintiffs have failed to allege the individual defendants' scienter. *See* Defs.' Br. 25. Because we conclude that plaintiffs have sufficiently pleaded scienter, *see* Section III.B.2, above, their Section 20(a) claim likewise survives. *See In re Virtu Fin., Inc. Sec. Litig.*, 770 F. Supp. 3d 482,

27

527-28 (E.D.N.Y. 2025) (allegations of scienter sufficient for Section 10(b) are also sufficient for Section 20(a)).

## C.    The Common Law Fraud Claim Is Barred Under SLUSA

Finally, defendants move to dismiss Orbis's fourth cause of action: state common law fraud.  Compl. ¶¶ 30, 303-309.[10]  Defendants argue that this claim is statutorily barred under the Securities Litigation Uniform Standards Act ("SLUSA"), which precludes private parties from filing: "(1) a covered class action (2) based on state law claims, (3) alleging that defendants made a misrepresentation or omission of a material fact (4) in connection with the purchase or sale of (5) covered securities."  15 U.S.C. § 78bb(f)(1); *Rayner v. E\*TRADE Fin. Corp.*, 899 F.3d 117, 119-20 (2d Cir. 2018).  The parties dispute only the first condition: whether this case, together with the Class Action, constitutes a "covered class action."

A "covered class action" includes "any group of lawsuits filed in or pending in the same court and involving common questions of law or fact" that collectively seek damages "on behalf of more than 50 persons" and "are joined, consolidated, or otherwise proceed as a single action for any purpose."  15 U.S.C. § 78bb(f)(5)(B)(ii).  Neither side disputes that the instant action and *In Re Vale* are pending in the same

---

[10] Though plaintiffs do not specify what "state common law" they rely on, *see* Compl. ¶¶ 30, 303-309, both parties seem to assume it is New York's. Defs.' Br. 11.  Our analysis would remain the same regardless.

court, "involv[e] common questions of law or fact," and together seek damages "on behalf of more than fifty people." *Id.; see In re AOL Time Warner, Inc. Sec. Litig.*, 503 F. Supp. 2d 666, 672 (S.D.N.Y. 2007) (fifty person requirement aggregated across both lawsuits). Thus, the relevant question is whether the actions "proceed as a single action for any purpose."

"Courts have recognized that Congress intended the clause 'for any purpose,' . . . to be broadly construed." *Kuwait Inv. Off. v. Am. Int'l Grp., Inc.*, 128 F. Supp. 3d 792, 812 (S.D.N.Y. 2015). Therefore, it is enough for the cases to be "coordinated, and not consolidated." *R.W. Grand Lodge of Free & Accepted Masons of Pennsylvania v. Meridian Cap. Partners, Inc.*, 634 F. App'x 4, 9 (2d Cir. 2015). And such coordination can be informal. *See Amorosa v. Ernst & Young LLP*, 682 F. Supp. 2d 351, 375 (S.D.N.Y. 2010), *aff'd*, 409 F. App'x 412, 417 (2d Cir. 2011). For example, in *Amorosa*, the court concluded that the plaintiff's opt-out action was proceeding "as a single action for any purpose" with the class action because the opt-out plaintiff had designated his case as "related" and "agreed to stay proceedings in his action pending resolution of a motion to amend [in the class action] and motions to dismiss [in another opt-out action]." *Id.* at 376. Similarly, in *Kuwait Investment Office*, the court found that the opt-out case was proceeding as a single action with the class action because the

defendants voluntarily produced discovery material already produced in the class action, "frequently drew upon decisions and litigation events in the Class Action," and, in fact, were subject to a case management order disallowing them from raising grounds for dismissal that had already been rejected in the class action.  128 F. Supp. 3d at 812-13.

For similar reasons, we conclude that the instant case and *In Re Vale* are proceeding as a single action for at least some sufficient purpose.  *First*, Orbis requested — and received — a judicial determination that this action is "related" to the Class Action.  *See* Motion for Reassignment, ECF No. 11; Order Reassigning Case dated Apr. 25, 2022.  *Second*, the parties have agreed to abide by prior rulings in the class action.  *See, e.g.*, Defs.' Mot. 1.  Indeed, Orbis repeatedly relies on decisions made in the Class Action.  *See, e.g.*, Defs.' Br. 1, 12.[11]  *Third*, the parties have coordinated discovery across both cases, including by stipulating that plaintiffs will accept "all documents and other discovery materials produced in the Class Action" and by obtaining permission for plaintiffs to "attend any depositions of defense witnesses and nonparties taken in the Class Action."  ECF No. 10-1 at 3-4; Docket Order dated Apr. 19,

---

[11] *See also* Compl. ¶¶ 27, 248, 251, 254, 257, 261, 264, 269, 272, 278, 281, 284, 287, 290, 293, 296, 300, 303, 306, 310, 314, 318, 322, 325, 329, 333, 336, 375, 398, 402, 405, 410, 411, 417, 445, 453, 478, 490, 499, 508 (referencing holdings in the class action).

2022 (so-ordered stipulation).  This case, together with the class action, therefore qualifies as a "covered class action" under SLUSA.  Plaintiffs' common law fraud claim is barred.

## IV.  Conclusion

For the reasons set forth above, the motion to dismiss is granted in part.  Plaintiffs' common law fraud claim is dismissed in its entirety, as is their Section 10(b) claim against defendant Poppinga.  We also dismiss plaintiffs' Section 10(b) and 20(a) claims based on the statements related to disclosure controls and procedures, as well as their claims based on scheme liability.  The Section 10(b) and 20(a) claims may otherwise proceed, except that each defendant's liability under Section 10(b) will be limited to the statements they individually made.  Finally, we dismiss plaintiffs' Section 18 claim based on the loss-causation event described in paragraphs 454-59 of the amended complaint.  The motion is denied in all other respects.


SO ORDERED.


/s/ Eric Komitee
ERIC KOMITEE
United States District Judge


Dated:    March 10, 2026
          Brooklyn, New York

31